The Full Commission has reviewed the prior Opinion and Award based on the record of the proceedings before Deputy Commissioner John A. Hedrick and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence or to amend the prior Opinion and Award.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement, at the hearing and by post-hearing agreement as:
STIPULATIONS
1. On the date of plaintiff's alleged injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On that date, an employment relationship existed between plaintiff and defendant.
3. A set of exhibits, including plaintiff's medical records, employee benefit records, attendance and employment records, a job description and plaintiff's answers to defendant's interrogatories, collectively marked as Stipulated Exhibit Number Two, is admitted into evidence.
4. An Industrial Commission Form 22, Wage Chart, marked as Stipulated Exhibit Number Three, is admitted into evidence.
5. A set of plaintiff's medical records received from plaintiff's counsel on 4 February 1997, consisting of records from JFK Medical Center and Dr. David Kin-Poon Tam, is admitted into evidence.
6. Six pages of plaintiff's medical records from Kinston Orthopaedic Associates, P.A., received by the Industrial Commission on 29 January 1997, are admitted into evidence.
EVIDENTIARY RULINGS
The objections appearing in the depositions of Dr. Warren and Dr. Boyette are OVERRULED.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner and finds as follows:
FINDINGS OF FACT
1. At the time of the hearing, plaintiff was a married male, thirty-four years old. He completed the twelfth grade of high school, but had no other formal education or training. He was experienced as an auto mechanic, a trade he had learned from his step-father. Before moving to North Carolina, plaintiff lived in New Jersey and worked part-time as an automobile mechanic. After moving to North Carolina in 1989, he worked as a mechanic for an Exxon service station. He also worked as a mechanic for Sears where his primary responsibility was mounting new tires on customers' vehicles. Plaintiff worked approximately six hours per day, four days per week while employed by Sears.
2. Plaintiff was left hand dominant. He had been a diabetic since the age of eleven. Since 1992, Dr. Warren treated plaintiff for his diabetes. However, prior to November 1996 plaintiff's diabetes was difficult to control and he experienced frequent incidents of hypoglycemia. While living in New Jersey, plaintiff underwent surgery for right carpal tunnel syndrome, stenosing tenosynovitis of his right index finger and removal of a mass from his right index ray. Plaintiff's carpal tunnel syndrome symptoms were aggravated by his work as a mechanic.
3. Plaintiff became employed by defendant as a distribution specialist in October 1989. Defendant was a manufacturer and distributor of faucets and sinks. As a distribution specialist, plaintiff had three primary duties. One duty was to construct faucet displays. Plaintiff constructed lavatory faucet, kitchen faucet and "do-it-yourself" faucet displays. To construct "do-it-yourself" faucet displays, plaintiff's only duty was to tape a box of hardware to a plastic mount. To construct kitchen faucet displays, plaintiff removed the faucet from a package, mounted it to a module by hand tightening two screw nuts and then placing it into a box. The lavatory faucets consisted of a shower head, a tub spout and a control. The tub spout and shower head were each attached with a lock nut. Plaintiff first tightened the nuts by hand and then completed the tightening by using a pair of channel locks. The control was attached with two screws which plaintiff tightened using a battery powered screw driver.
4. Plaintiff constructed approximately one hundred twenty-five faucet displays per week. Of this number, approximately one-half were "do-it-yourself" faucet displays. The remainder consisted of a combination of lavatory and kitchen faucet displays. The number of displays he constructed on a given day varied depending upon demand. At times, plaintiff constructed displays for the duration of his entire work shift. Display assembly duties consumed approximately one-half of plaintiff's scheduled work hours. The remainder of his work consisted of fork lift operation, "mini-pallet" construction and packaging of stone, stainless steel and plastic sinks.
5. Construction of mini-pallets involved folding corrugated cardboard. The mini-pallets were then loaded with faucets and wrapped in plastic for shipment to defendant's customers.
6. The stone sinks plaintiff packaged weighed as great as sixty-seven pounds. The stainless steel sinks weighed ten pounds and the plastic sinks weighed approximately three pounds. When he was required to package stone sinks, he retrieved the sinks from a pallet, inspected them for chips or cracks and gauged their thickness. Plaintiff lifted and turned the sinks over twice during the inspection process. After inspecting the sinks, he lifted them and placed them into a box. Plaintiff placed eight cardboard "corners" into each box. Each "corner" was folded three times. After packing a box with a sink and the "corners", plaintiff taped the box and lifted it onto a pallet, placing the boxes into stacks of three. The third box had to be lifted to a height of approximately four feet. Plaintiff packed approximately thirty stone sinks per day.
7. During his employment with defendant, plaintiff continued to work as a mechanic, both as a hobby and as a source of income. At times, plaintiff earned income by repairing automobiles for his co-workers.
8. In November 1994, plaintiff began experiencing pain and numbness in his right long finger. He later began experiencing pain and numbness in his left hand. Plaintiff received treatment or examinations for these symptoms from Drs. McGillicuddy, Lopez, Boyette and Warren. On 9 November 1994, Dr. Lopez conducted EMG and nerve conduction studies on plaintiff's upper extremities. On that date, plaintiff had sensory motor peripheral polyneuropathy and bilateral median mononeuropathies at or distal to his wrists. By April 1995, plaintiff was also experiencing left shoulder pain. Plaintiff received treatment for this symptom from Dr. Boyette.
9. Plaintiff's left hand symptoms were caused by carpal tunnel syndrome. His left shoulder symptoms were caused by subacromial bursitis and acromioclavicular (AC) joint impingement.
10. On 14 August 1995, Dr. Boyette performed a left carpal tunnel release. As a result of his carpal tunnel syndrome and his surgery on 14 August 1995, plaintiff was incapable of returning to work for defendant for three weeks. However, as of 8 September 1995, plaintiff was incapable of returning to work for defendant as a result of his left shoulder pain. On 18 September 1995, plaintiff underwent left shoulder surgery by Dr. Boyette during which she performed a subacromial decompression, open bursectomy and distal clavicle resection. As a result of this surgery, plaintiff was excused from work until 15 January 1996. Plaintiff returned to work for defendant-employer on 15 January 1996 and resumed performance of his usual duties.
11. Plaintiff received disability benefits at the rate of $115.00 per week from 21 August 1995 through 14 January 1996. The benefits plaintiff received were from a policy which was funded solely by defendant.
12. Plaintiff did not inform defendant of the alleged work-related nature of his hand and shoulder conditions until nine weeks after returning to work for defendant. However, the evidence of record is insufficient to prove by its greater weight that plaintiff knew or had reason to know of the alleged work-related nature of these conditions prior to that date.
13. Plaintiff's carpal tunnel syndrome was not caused by his employment with defendant. Rather, this condition was caused by his poorly controlled diabetes.
14. Plaintiff's subacromial bursitis and acromioclavicular (AC) joint impingement was caused by the application of intermittent pressure during his employment with defendant.
15. As a result of his subacromial bursitis, acromioclavicular (AC) joint impingement and surgery on 18 September 1995, plaintiff was incapable of earning wages from defendant or any other employer from 8 September 1995 through 14 January 1996.
16. Plaintiff's left shoulder condition reached maximum medical improvement on 26 January 1996. On that date, plaintiff retained a twelve percent permanent impairment of his left arm as a result of his subacromial bursitis and acromioclavicular (AC) joint impingement.
17. Plaintiff's average weekly wage was $355.53.
* * * * * * * * * * *
Based on the foregoing findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff's subacromial bursitis and acromioclavicular (AC) joint impingement was due to intermittent pressure in his employment with defendant and was therefore, an occupational disease. N.C. Gen. Stat. § 97-53(17).
2. Plaintiff's claim for compensation for his occupational disease was timely filed. N.C. Gen. Stat. § 97-58; N.C. Gen. Stat. § 97-22.
3. As a result of his occupational disease, plaintiff is entitled to payment of temporary total disability compensation at the rate of $237.03 per week from 8 September 1995 through 14 January 1996. N.C. Gen. Stat. § 97-29.
4. As a result of his occupational disease, plaintiff is entitled to permanent partial disability compensation at the rate of $237.03 per week for 28.8 weeks beginning 26 January 1996. N.C. Gen. Stat. § 97-31(13).
5. Plaintiff is entitled to payment of all medical expenses incurred as a result of his subacromial bursitis and acromioclavicular (AC) joint impingement for so long as such examinations, evaluations and treatments tend to effect a cure or give relief. N.C. Gen. Stat. § 97-59.
6. Defendant is entitled to a credit at the rate of $115.00 per week from 8 September 1995 through 14 January 1996. Defendant is entitled to apply this credit against the temporary total disability compensation due plaintiff. N.C. Gen. Stat. § 97-42.
* * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendant shall pay plaintiff temporary total disability compensation at the rate of $237.03 per week from 8 September 1995 through 14 January 1996. This amount shall be paid in a lump sum, subject to the credit due defendant in paragraph 4 and the attorney's fee approved in paragraph 5.
2. Defendant shall pay plaintiff permanent partial disability compensation at the rate of $237.03 per week for 28.8 weeks beginning 26 January 1996. This amount shall be paid in a lump sum, subject to the attorney's fee approved in paragraph 5.
3. Defendant shall pay all medical expenses incurred by plaintiff as a result of his subacromial bursitis and acromioclavicular (AC) joint impingement for so long as such examinations, evaluations and treatments tend to effect a cure or give relief.
4. Defendant shall receive a credit at the rate of $115.00 per week from 8 September 1995 through 14 January 1996 against temporary total disability compensation due plaintiff in paragraph 1.
5. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff is approved for plaintiff's attorney and shall be paid as follows: twenty-five percent of the lump sums due plaintiff in paragraphs 1 and 2 of this Award, after the credit allowed defendant, shall be deducted from those amounts and paid directly to plaintiff's attorney.
6. Defendant shall pay the costs.
 S/ ___________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ _________________ DIANNE C. SELLERS COMMISSIONER
S/ _________________ KIM L. CRAMER DEPUTY COMMISSIONER